IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 16-04-GMS |
| | ) | |
| MICHAEL KING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM

### I.    INTRODUCTION

On January 7, 2016, the Grand Jury for the District of Delaware indicted Defendant Michael King ("Mr. King") for one count of knowingly possessing a firearm that moved in interstate commerce after having been convicted of a crime punishable by imprisonment for a term exceeding one year. *See* (D.I. 8). Presently before the court is Mr. King's Motion to Suppress Evidence. (D.I. 20). Judge Andrews held an evidentiary hearing in connection with this motion on September 20, 2016. After the hearing, Defendant filed his post-hearing brief. (D.I. 29). The Government filed a letter outlining potential reasons why Judge Andrews should recuse himself. (D.I. 30). On November 3, 2016, Judge Andrews decided to recuse himself, recognizing that he had previously supervised the prosecution of Mr. King for a similar crime in his role as Criminal Chief in the United States Attorney's Office. After reassignment, the Government filed its post hearing brief. (D.I. 33). For the reasons that follow, the court will deny Mr. King's motion to suppress.

## II.    FINDINGS OF FACT

At the evidentiary hearing before Judge Andrews on September 20, 2016, the United States called one witness, Trooper Austin Andres ("Trooper Andres"). (D.I. 25). Mr. King did not call any witnesses. *Id.* The court held a Teleconference on November 16, 2016, to discuss Judge Andrews' recusal and to determine whether another evidentiary hearing was necessary. Both Defendant and the Government agreed that "the record . . . [was] clear from the evidentiary hearing," witness credibility determinations by this court were, therefore, unnecessary, and the only issue to be resolved was a legal one: when was Mr. King seized by Trooper Andres? Teleconference Tr. 3:10–20. The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure. The following findings of fact were made from the testimony of Trooper Andres, (D.I. 29-1), the audio recording admitted into evidence as Government Exhibit 1, (D.I. 29-1, Ex. 1), and the audio-video recording admitted into evidence as Government Exhibit 2, (D.I. 29-1, Ex.2).

At about 8:00pm on December 4, 2015, Trooper Andres reported to the hibachi restaurant in Glendale Plaza in Bear, Delaware, in response to a radio transmission from dispatch stating that two males were fighting in the lobby of the restaurant. (D.I. 29-1, Ex. 2 at 4:19–5:1). The dispatcher requested that "[u]nits respond to the Hibachi in Glendale Plaza, in reference to a couple of disorderly subjects." (D.I. 29-1, Ex.1 at 0:00–0:47). The dispatcher also relayed the description of the subjects and specific events noted by the reporting party ("RP"):

> You have a 24-year-old black male wearing a dark-colored hoodie and a 24-year-old white male, brown hair, also wearing a dark-colored hoodie and blue jeans. The two subjects were inside the restaurant fighting. RP initially advised that one left and one was still inside the restaurant and we were further updated that they both left the restaurant, possibly still in the parking lot.

2

*Id.*

Trooper Andres indicated to the dispatcher that he could respond to the request for investigation at the Hibachi. (D.I. 29-1, 8:9–11). Trooper Andres arrived at the Hibachi about a minute after he communicated to the dispatcher that he would respond. *Id.* 8:9–11. When Trooper Andres arrived at the Hibachi, he parked his car slightly past the entrance of the restaurant, walked through the front entrance door, and opened the interior door leading to the lobby. *Id.* 8:14–22.

Upon walking into the lobby of the Hibachi, Trooper Andres made eye contact with RP, the host of the restaurant. *Id.* 8:23–24. Without walking over to RP, Trooper Andres asked RP if he called the police. *Id.* 8:25. In response to Trooper Andres question, RP nodded yes and then pointed to a black male subject leaning against the front lobby windows inside of the restaurant. *Id.* 9:2–4. The subject that RP pointed to was wearing a dark hooded sweatshirt, grey jeans, and black sneakers. *Id.* 9:10. During the hearing, Trooper Andres confirmed that the subject RP pointed to was, in fact, Mr. King. *Id.* 9:11–12.

When RP pointed at Mr. King, Mr. King stopped leaning on the front window and started walking toward Trooper Andres. *Id.* 9:15–16. At that time, Trooper Andres was standing in front of the entrance to and exit from the Hibachi. *Id.* 9:18–19. When Mr. King started walking toward Trooper Andres, Trooper Andres put his "arm out across the doorway and told [Mr. King] to stop" because Trooper Andres "needed to talk to [him] for a second." *Id.* 9:21–22. Mr. King "immediately turned around [and] started walking back inside the Hibachi towards the seating area where people were dining." *Id.* 9:24–25. Mr. King was walking at a fast pace away

3

from Trooper Andres, and, even after Trooper Andres told him to stop, Mr. King did not respond and continued to walk away. *Id.* 10:1–7.

When Mr. King did not respond to Trooper Andres requests to stop walking, Trooper Andres took hold of the back of Mr. King's black, hooded sweatshirt, turned him around, and walked him out of the restaurant. *Id.* 10:9–11. Once Trooper Andres took hold of Mr. King's sweatshirt, Mr. King complied and walked with Trooper Andres out of the restaurant. *Id.* 10:15–19. Trooper Andres did not drag Mr. King out of the restaurant. *Id.*

Trooper Andres let go of Mr. King's sweatshirt once they were outside of the Hibachi. *Id.* 11:1–2. When Trooper Andres and Mr. King began to speak outside of the Hibachi, Trooper Andres noticed the smell of alcohol emanating from Mr. King, and he also noticed that Mr. King had glassy, bloodshot eyes. *Id.* 11:1–6. When Trooper Andres asked Mr. King what had happened that night, Mr. King repeatedly stated that he did not do anything wrong, but he was drunk. *Id.* 11:14–15. Trooper Andres asked Mr. King if he had any identification on him. *Id.* 11:16–21. Mr. King pulled out his wallet and handed Trooper Andres a credit card even though Trooper Andres observed a Delaware identification in Mr. King's wallet. *Id.* Trooper Andres asked to see Mr. King's identification card, and Mr. King responded by telling Trooper Andres his name but asking the trooper not to "run" him. *Id.* 12:3–4. This caused Trooper Andres to think that Mr. King had something to hide. *Id.* 12:7–8.

During Trooper Andres' conversation with Mr. King outside of the Hibachi, Trooper Andres observed that Mr. King continually placed "his hands inside of his front jean pockets." *Id.* 12:9–11. Trooper Andres asked Mr. King "many times" to stop placing his hands in his pockets during questioning. *Id.* 12:12–14. When Mr. King failed to comply with the Trooper's orders to

4

keep his hands out of his pockets, Trooper Andres told Mr. King he had to pat him down. *Id.* 13:1. While patting him down, Trooper Andres asked Mr. King if he had anything on him that could harm the Trooper. *Id.* 13:1–3. Mr. King did not respond to the Trooper's question. *Id.* 13:7.

Trooper Andres found nothing in Mr. King's front pockets during the pat down. *Id.* 13:8–9. When the Trooper tried to pat down Mr. King's back pockets and waistband, Mr. King pushed the Trooper's hand away and started to back away from him. *Id.* 13:10–15. When Mr. King started to turn away from Trooper Andres, the Trooper said, in a "command voice," *id.* 13:20, "stop, don't move, let me see your hands." *Id.* 13:16. Mr. King tried to walk away and Trooper Andres pushed him up against the patrol car to stop him. *Id.* 13:22–23. At that point, Trooper Andres also pulled out his "department issued taser," *id.* 14:1, and he turned on his microphone. *Id.* 14:10. When the microphone is turned on, the camera in the patrol car also begins recording. *Id.* 14:11–17. Trooper Andres testified that he pulled out his taser and turned on the microphone and camera for his safety—Mr. King did not want Trooper Andres to pat down his back and the Trooper was not sure "what [Mr. King] had back there. *Id.* 14:2–5.

Again, Trooper Andres said to Mr. King "stop moving, let me see your hand[s]." *Id.* 15:15–17. Trooper Andres asked Mr. King to put his hands behind his back so that the Trooper could "obtain control" of him and "finish the pat down to see if [Mr. King] had anything that he was trying to hide." Trooper Andres' testimony is corroborated by the audio-video recording admitted into evidence during the Suppression Hearing. (D.I. 29-1, Ex. 2 0:00-1:38). Trooper Andres' repeatedly tells Mr. King to "turn around" and "put [his] hands behind his back." *Id.* 1:21–1:24. Trooper Andres can also be heard saying to Mr. King "where are you going?" *Id.*

5

1:23. Mr. King continually responds "I am not threatening," *id.* 1:17–1:20, and "I did not do anything." *Id.* But Trooper Andres responds "turn around, then." *Id.* 1:28. It is clear from the recording that Mr. King is not complying. Trooper Andres, almost immediately after asking Mr. King to "turn around," says "do not run." *Id.* 1:31. Trooper Andres testified that Mr. King tried to walk in front of his patrol car at first and then toward the rear of the Trooper's patrol car. Tr. 16:18–20. Mr. King told Mr. Andres that the reason he was walking away was because the Trooper was "making [him] feel threatened." (D.I. 29-1, Ex. 2 1:35-1:38. Trooper Andres responded, "you are making me feel threatened. You keep pulling away." *Id.*

When Mr. King walked past the rear of the patrol car, Trooper Andres reached out and grabbed the back of Mr. King's sweatshirt to "prevent him from walking away." Tr. 16:24–17:2. Mr. King continued to pull away when Trooper Andres grabbed his sweatshirt, causing the back of Mr. King's sweatshirt to lift up. *Id.* 17:5–8. When Mr. King's sweatshirt lifted up slightly, Trooper Andres observed a black handgun tucked into the back of Mr. King's waistband. *Id.* Upon seeing the gun, Trooper Andres activated his department issued taser. *Id.* 17:9. Mr. King fell to the ground when he was tased. *Id.* 18:18–20. Because Mr. King landed on his stomach, Trooper Andres was able to grab the gun from Mr. King's rear waistband and distance himself slightly from Mr. King. *Id.* 17:20–22.

Once Trooper Andres distanced himself from Mr. King, while still pointing the taser at him, Trooper Andres instructed Mr. King to remain on his stomach and not move. *Id.* 17:24. Trooper Andres deployed his taser a second time when Mr. King sat up and began to reach for his ankle, despite being told to stay laying on his stomach. *Id.* 19:9–12. Trooper Andres testimony is corroborated by the audio-video recording. (D.I. 29-1, Ex. 2). Trooper Andres can be heard on

the recording stating, "do not reach for that." *Id.* 1:59–2:00. Because Trooper Andres had not completed the pat down at that point, he was unsure of whether Mr. King had another handgun hidden on his person, possibly in an ankle holster. Tr. 19:9–17. Mr. King was never told that he was under arrest during his interaction with Trooper Andres. *Id.* 20:1. Trooper Andres testified that he called for backup when he pushed Mr. King up against his patrol car. *Id.* 29:1–12. Backup arrived at 8:18pm. (D.I. 29-1, Ex. 2 at 3:55).

### III. CONCLUSIONS OF LAW

Mr. King's proposed findings of fact and conclusions of law with respect to his motion to suppress focus on three aspects of the events that unfolded on the night of December 4, 2015: (1) the *Terry* stop; (2) the *Terry* frisk; and (3) the arrest. The main issue this court is asked to decide is "whether it is proper to conduct a *Terry* stop for the purpose of investigating a completed misdemeanor." (D.I. 29 at 6). Neither the Supreme Court nor the United States Court of Appeals for the Third Circuit have decided this issue explicitly. The Eighth, Ninth and Tenth Circuits use the *U.S. v. Hensley*, 469 U.S. 221 (2003) test to conduct a case-by-case analysis whereby the seriousness of the police intrusion is balanced against the governmental interest in conducting the search. *See United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2008); *United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007); *United States v. Moran*, 503 F.3d 1135, 1141 (10th Cir. 2007). The Third Circuit also cited to the *Hensley* test in an unpublished, non-precedential opinion analyzing a *Terry* stop for the purpose of investigating a recent violation of a protection from abuse order. *United States v. Douglas*, 522 F. App'x 125, 128, n.2 (3d Cir. 2013). The Sixth Circuit, however, in a footnote considered dicta, deemed *Terry* stops to investigate completed misdemeanors to be categorically impermissible. *Gaddis ex rel. Gaddis v.*

7

*Redford Township*, 364 F.3d 763, 771 n.6 (6th Cir. 2004). Mr. King argues that regardless of whether this court decides to adopt the categorical exclusion adopted by the Sixth Circuit or the balancing test used by the Eighth, Ninth, and Tenth Circuits, the gun found incident to the *Terry* frisk must be excluded because Trooper Andres did not have reasonable suspicion to perform a *Terry* stop. The court disagrees. The court will proceed by analyzing the legality of the *Terry* stop, the *Terry* frisk, and the subsequent arrest.

      **a.**    ***Terry* Stop**

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1 (1968), the court found that, while brief investigative stops were subject to the Fourth Amendment, there existed an exception to the general rule requiring a warrant prior to a seizure: "a police officer may conduct [an investigative] stop . . . if the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Terry*, 392 U.S. at 21). In judging the reasonableness of an officer's investigatory stop, courts must ask themselves whether the facts available to the officer at the moment of seizure support a "a reasonable, articulable suspicion that criminal activity [was] afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). As such, courts must first pinpoint the moment of seizure. *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015). Courts must also consider the intrusiveness of the stop and "balance[] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985).

"A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.' " *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991). To clarify, a seizure has occurred when the officer physically touches the suspect in an effort to restrain him, regardless of whether the physical force does in fact restrain him. *Id.*; *see Hodari D.*, 499 U.S. at 625 (holding that the case did not involve seizure by physical force because Hodari was not touched by Officer Pertoso at the time he discarded the cocaine). Alternatively, a seizure can occur when a suspect submits to an officer's words or actions that convey to a reasonable person an order to restrict their movement. *Hodari D.*, 499 U.S. at 626. If the suspect fails to yield to such an order, however, no seizure has occurred. *Id.*

The core of Mr. King and the Government's disagreement concerns when the seizure occurred. The court must assess all of the events of the night to determine when there was submission to Trooper Andres' authority or when Troop Andres physically restrained Mr. King's movement.

Trooper Andres responded to a radio call at the Hibachi in Glendale plaza that the dispatcher described as a "fight" between two "disorderly subjects." *See* (D.I. 29-1, Ex. 1 at 0:00–0:41). The dispatch reported that "two subjects were inside the restaurant fighting," and that one or both of the men then left, but were possibly still in the parking lot. *Id.* When Trooper Andres arrived at and entered the Hibachi, he made eye contact with the host and asked "did you call the police?" Tr. 8:21–25. "The host then nodded and gestured toward [Mr. King], who was leaning against the windows inside the lobby of the restaurant." Tr. 9:1–8. According to both

9

the Government and Mr. King, when the host gestured towards Mr. King, Mr. King attempted to leave the restaurant. *Id.* 9:15–16; (D.I. 29 at 8). To do so, he had to pass by Trooper Andres. Tr. 9:15–22. Trooper Andres responded to Mr. King's actions by putting his arm up to bar the doorway and stating that he needed to speak with Mr. King. Tr. 21–22. By both accounts, Mr. King then turned around and walked deeper into the restaurant. Tr. 24–25; (D.I. 29 at 8). Trooper Andres on at least one occasion told Mr. King to stop walking so that they could talk. Tr. 10:4–5. Mr. King did not listen to Trooper Andres' request. *Id.* 10:7. At that point, Trooper Andres pursued Mr. King into the restaurant, caught up to him, and took hold of the back of his sweatshirt to forcibly walk him toward the exit. *Id.* 10:9–11.

The court need not decide whether the facts known to Trooper Andres at the time he put his arm up to bar Mr. King from exiting the Hibachi restaurant were enough to render the stop constitutionally sound. When Mr. Andres put his arm up to bar the exit that action likely qualified as a show of authority. *See Florida v. Royer*, 460 U.S. 491, 502 (explaining how a show of authority occurs when a reasonable person would understand that they were not free to walk away). Mr. King did not submit to that show of authority, however. *See United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009) (holding that Waterman's actions in moving his hands toward his waistband and retreating into his house in response to the officer's order to put his hands in the air was not a seizure within the meaning of the Fourth Amendment); *United States v. Johnson*, 238 F. Supp. 2d 663, 671 (D. Del. 2002) (holding that actions in noncompliance with an officer's orders, as opposed to mere inaction, will negate a seizure within the meaning of the Fourth Amendment). The court finds that Trooper Andres did not seize Mr. King until he grabbed Mr. King by the sweatshirt and brought him outside of the Hibachi

10

restaurant. Such an action constituted an application of physical force, used to restrain Mr. King's movement.

Now that the court has determined the moment Trooper Andres seized Mr. King, it must decide whether the facts available to Trooper Andres right before that seizure occurred supported a reasonable suspicion that criminal activity was afoot. An articulable suspicion of criminal activity is defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. The court looks at the "totality of the circumstances," which can include Mr. King's location, his "nervous behavior and evasiveness," and Trooper Andres' common sense inferences, given his experience and specialized training. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003). As the court has previously stated, it may also take into account all of Mr. King's noncompliant conduct after Trooper Andres put his arm up to block Mr. King's exit from the Hibachi restaurant so that the Trooper could speak with him. *See Lowe*, 791 F.3d at 431 ("[A] suspect's conduct in the interval between the show of authority and the submission can be considered in determining the reasonableness of the eventual seizure.").

First, Mr. King tried to leave the restaurant after the host identified him to Trooper Andres. Tr. 9:13–16. Mr. King does not dispute the fact that when Trooper Andres asked to speak with him he turned around and began to walk quickly into the back of the restaurant. *See* Tr. 9:23–25, 10:1–2. Mr. King also does not dispute the fact that he repeatedly ignored Trooper Andres' requests to stop walking and talk to him. *Id.* at 10:3–7. It was only after Mr. King ignored Trooper Andres' requests that Trooper Andres took hold of Mr. King's sweatshirt. *Id.* 10:9–14. All of this occurred in a populated restaurant, and Trooper Andres testified that he was

11

concerned with Mr. King continuing to walk further back into the restaurant toward the other patrons. *See* Tr. 10:9–14. Considering these events as a collective whole, the court concludes that a reasonable suspicion justified Trooper Andres' seizure. *See Wardlow,* 528 U.S. at 124 (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Moorefield,* 111 F.3d 10, 14 (3d Cir. 1997) (holding that a refusal to obey an officer's orders constitutes suspicious behavior warranting a Terry frisk).

Mr. King argues that, at the time of the seizure, there was no reason to believe that criminal activity was afoot because he "was standing alone quietly in the lobby area of the restaurant, there was no indication that further disorderly conduct would erupt, and there was no property damage done to the restaurant as a result of the earlier verbal altercation." (D.I. 29 at 5). Further, Mr. King contends that, "because 'disorderly conduct' is among the most minor of Delaware offenses, the law enforcement interest in investigating a completed disorderly conduct offense is not so great as to justify a warrantless seizure." (D.I. 29 at 7); *see* 11 Del. Code § 1301. As the court previously noted, there is no need to decide whether seizure would have been proper at the moment Trooper Andres put his arm up to prevent Mr. King from leaving the Hibachi restaurant. It is important, however, to distinguish between what Mr. King may have known to be true at the moment Trooper Andres arrived at the restaurant and the facts available to Trooper Andres at that same moment.

The dispatcher requested that units respond to the Hibachi restaurant "in reference to a couple of disorderly subjects." The dispatcher also reported that "[t]wo subject were inside the restaurant fighting. RP initially advised that one left and one was still inside the restaurant and we were further updated that they both left the restaurant, probably still in the parking lot." *See*

(D.I. 29-1, Ex. 1 at 0:00–0:47). Trooper Andres had no idea that "[n]obody was harmed," "[n]o property damage was incurred, "and any disorderly conduct terminated at least 20 minutes prior." (D.I. 29 at 8). When Trooper Andres entered the restaurant with only the facts supplied by the dispatcher and saw that Mr. King was in the restaurant, Trooper Andres concluded he "came back in." Tr. 52:5–10. Mr. King's presence in a restaurant with other patrons, the fact that Trooper Andres did not know where the other man involved in the fight was, and Mr. King's evasive behavior all support a reasonable suspicion of ongoing criminal activity, thereby justifying Mr. King's seizure.

The court also finds that the nature and quality of the intrusion on Mr. King's personal security was justified by the important governmental interest in preventing disorderly conduct by intoxicated patrons of a populated establishment. *See United States v. Douglas*, 522 F. App'x 125, 128 (3d Cir. 2013) (holding that a brief, seven-minute stop was "reasonably designed to protect [an] important state interest" even though the defendant was no longer committing the misdemeanor when he was stopped). In *Douglas*, the officer stopped the defendant on the street after he had violated a protection from abuse order earlier in the day. The facts at issue in this case present an even more compelling reason to stop and question Mr. King. Not only was Mr. King found *inside* of the populated restaurant where the conduct which occasioned the radio call occurred, but also, he tried to run deeper into the restaurant, towards patrons and away from Trooper Andres. The court finds that Trooper Andres' actions in grabbing Mr. King's sweatshirt and bringing him outside of the restaurant to discuss the events of the night were justified by the important state interest in keeping order in populated places. (D.I. 33 at 9–10).

13

### b.   *Terry* Frisk

When reasonable suspicion leads an officer to conduct a brief investigatory stop, an officer may also execute "a reasonable search for weapons" so that the officer can proceed with his investigation without fear of harm. *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* If the search goes beyond determining whether the suspect is armed, and is used instead to discover evidence of a crime, it is no longer a valid *Terry* search. *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Any evidence discovered incident to such a search must be suppressed. *Id.* Here, the court finds that Mr. King's firearm was discovered incident to a valid *Terry* search.

When Trooper Andres brought Mr. King outside of the restaurant to speak with him, Trooper Andres realized that Mr. King was intoxicated. Tr. 11:3–15. Mr. King actually informed Trooper Andres that he was drunk. *Id.* When Trooper Andres asked Mr. King for identification, Mr. King gave Trooper Andres his credit card instead. *Id.* at 20–21. Trooper Andres testified that he saw a Delaware ID card when Mr. King opened his wallet. *Id.* at 22–23. When Trooper Andres asked to see the Delaware ID card instead of Mr. King's credit card, Mr. King said, "I'll tell you my name but don't run me." Tr. 12:3–4. Trooper Andres testified that Mr. King's evasiveness made him think "he had possibly something to hide, or maybe a warrant." *Id.* at 7–8. Trooper Andres also testified that Mr. King repeatedly placed his hands inside of his pockets, and continued to do so even after the Trooper asked him not to. *Id.* at 11–19. A number of other courts have found similar behavior sufficient to justify as *Terry* frisk. *See*

14

*United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (explaining that the officers were justified in conducting a *Terry* frisk because, while they knew the defendant had consumed alcohol, they had no way of knowing how much he consumed and the officers could rightfully assume that the defendant may do something "unpredictable, unwise, and dangerous"); *See United States v. Mouscardy*, 722 F.3d 68, 75 (1st Cir. 2013) (finding the defendant's refusal to remove his hands from his pockets despite officers' requests to do so was relevant in determining that the *Terry* frisk was justified); *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (stating that the defendant's lack of any identification on his person led officers to believe he may be trying to conceal his identity, "spur[ing] safety concerns").

The court finds that Trooper Andres' protective frisk of Mr. King was justified given the fact that Mr. King asked the Trooper not to run his name, he repeatedly put his hands in his pockets, and he was intoxicated.  Mr. King contends that only a protective search of his front pockets was warranted because he was not continually putting his hands in his back pockets. That argument is unpersuasive.  The case law does not support Mr. King's proposition that a *Terry* frisk must be limited to the area on the suspect where the officer believes a weapon may be located.  *See Dickerson*, 508 U.S. at 373 (explaining that if an officer is justified in believing that the subject who he is investigating may be armed or dangerous, he may conduct a pat down search to determine if the suspect is carrying a weapon).

### c.   Arrest

For an arrest to be constitutionally sound, the arresting officer must have probable cause. *See Hayes v. Florida*, 470 U.S. 811, 813 (1985).  "Probable cause to arrest exists when the facts and the circumstances within the arresting officer's knowledge are such that he can form a

15

reasonable belief that an offense has been or is being committed by the arrestee." *Jordan v. Town of Milton*, No. CIV.A. 11-00514-GMS, 2013 WL 105319, at *5 (D. Del. Jan. 3, 2013) (citing *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir.2000)). To determine when a suspect is considered "under arrest" or "in custody," the court must analyze the totality of the circumstances. *See United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984) ("[T]he Supreme Court adopted a 'totality of the circumstances' approach to evaluating whether probable cause exists.") (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). The key inquiry is "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). As the court has previously stated, an investigative stop does not necessarily transform into an arrest every time force is used to restrain a suspect. *See United States v. Prince*, 157 F. Supp. 2d 316, 324 (D. Del. 2001). When a suspect resists a *Terry* frisk, or attempts to escape during an investigative stop and frisk, "then more intrusive or forceful measures may be warranted without turning the detention into an arrest." *Id.* at 325.

Here, Mr. King argues that at the time he was arrested, Trooper Andres had no probable cause to arrest him. (D.I. 29 at 16). Mr. King contends that he was arrested during the investigative frisk, before Trooper Andres found Mr. King's weapon. *Id.* Mr. King admits that when Trooper Andres attempted to pat-down his back pockets, he pushed Trooper Andres' hands away and started to back away. (D.I. 29 at 16). Trooper Andres testified that when Mr. King pushed him away during the frisk, he "pushed [Mr. King] up against [the patrol] car," and pointed his taser at Mr. King. Tr. 13:13–14. Trooper Andres also ordered Mr. King to turn

16

around and put his hands behind his back. Tr. 46:6–13. Mr. King contends that he was arrested at the moment Trooper Andres pushed Mr. King up against the patrol car and told him to put his hands behind his back. (D.I. 29 at 16). The court disagrees.

The court finds that the arrest occurred after Trooper Andres saw Mr. King's firearm. Pushing Mr. King up against the car and telling him to place his hands behind his back were Trooper Andres' efforts to protect himself until he could complete the frisk and ensure that Mr. King was not armed and dangerous. *See Prince*, 157 F. Supp. 2d. at 325 (finding that the use of handcuffs and placing the defendant in the back of the police car did not constitute an arrest because they were necessary to assure officer safety during the investigatory stop). Trooper Andres saw Mr. King's firearm when he pulled Mr. King's sweatshirt hood to restrain him from walking away during the protective frisk. Tr. 17:5–8. Again, the court finds that preventing Mr. King from walking away during the frisk was consistent with the goals of *Terry* frisks—ensuring the officer's safety during the pendency of an investigative stop. *See Terry*, 392 U.S. at 23 (holding that police officers have an interest in "taking steps to assure [themselves] that the person with whom [they] [are] dealing is not armed with a weapon" and they should not be required to take "unnecessary risks in the performance of their duties").

Considering the totality of the circumstances, Trooper Andres' use of force during the *Terry* frisk was justified and did not turn the stop into an arrest. Mr. King was intoxicated, Trooper Andres was the only officer present at the scene, Mr. King was being evasive, and Mr. King refused to follow orders during the frisk. Mr. King, therefore, was not in custody prior to when Trooper Andres spotted the weapon on Mr. King's person. Mr. King does not dispute that

17

the arrest was based on probable cause after Trooper Andres spotted the weapon.  The court thus finds that the arrest was constitutionally sound.

## IV.    CONCLUSION

For the foregoing reasons, the court hereby denies Defendant's motion to suppress.

Dated: March 21, 2017

UNITED STATES DISTRICT JUDGE

18